# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 13-00135-CR-W-JTM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following Plea Agreement:

1. **The Parties**. The parties to this agreement are the United States Attorney's Office for the Western District of Missouri, represented by Tammy Dickinson, United States Attorney, and Gene Porter, Deputy United States Attorney; the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section, by Ignacia S. Moreno, Assistant Attorney General, and Jennifer A. Whitfield, Senior Trial Attorney (otherwise referred to as "the government" or "the United States"); and the defendant, Wal-Mart Stores, Inc. (hereinafter referred to as "defendant" or "Wal-Mart"), represented by James L. Eisenbrandt.

Except as expressly set forth in Paragraph 8 below, this Agreement is limited to the United States Attorney's Office for the Western District of Missouri and does not bind any other federal, state, or local prosecuting, enforcement, administrative or regulatory authorities. It also does not provide waiver of or preclude any civil or administrative actions, sanctions, or penalty, including but not limited to, suspension, debarment, or listing.

2. **Defendant's Guilty Plea.** Solely for the purpose of this Agreement and for no other purpose, defendant agrees to and hereby does waive indictment by grand jury and plead

guilty to an information charging defendant with a violation of 7 U. S. C. §§ 136j(a)(1)(A) and 136*l*(b)(1)(B) for knowingly aiding and abetting the distribution of pesticides that were not registered under 7 U. S. C. § 136a. This is a Class A misdemeanor. By entering into this Plea Agreement, the defendant admits that, by and through its employees, it knowingly committed this offense, and is in fact guilty of this offense.

      3.    **Factual Basis for Guilty Plea.**  The parties agree that the facts constituting the offense to which the defendant is pleading guilty are as follows:

      The manufacture, distribution, and use of pesticides is regulated by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Title 7, United States Code, §§ 136 *et seq.*, and the regulations promulgated under its authority by the United States Environmental Protection Agency ("USEPA), 40 C.F.R. Part 152 et seq. Except as provided by law, no person may distribute or sell any pesticide in the United States without its first being registered by the USEPA. 40 C.F.R. Part 152.15. Also, every pesticide product shall bear a label that clearly and prominently shows the product registration number, ingredients, and directions for use. 40 C.F.R. Part 156.10(a). The term "pesticide" includes any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, or for use as a plant regulator, defoliant, or desiccant. 7 U.S.C. § 136(u). Title 7, United States Code, Section 136(gg) defines the terms "distribute or sell," *inter alia*, to distribute, sell, offer for sale, hold for distribution, or hold for sale. Any person who distributes or sells pesticides, and knowingly violates any provision of FIFRA shall be guilty of an offense. 7 U.S.C. § 136*l*(b)(1)(B).

      Defendant Wal-Mart is a public corporation based in Bentonville, Arkansas. Wal-Mart operates over 4,100 retail stores throughout the United States. Various types of regulated solid and liquid household pesticides were sold in the garden centers of Wal-Mart's retail stores. Pesticides that became damaged during the normal course of business and/or that were returned by customers were collected by the retail stores and transported to one of six collection and

2

processing locations referred to as "return centers." At the time of the incidents described below, Wal-Mart operated return centers in Bentonville, Arkansas; Waco, Texas; Indianapolis, Indiana; Macon, Georgia; Las Vegas, Nevada; and Johnstown, New York.

In or about July 2006, Wal-Mart began shipping certain damaged household products, including regulated solid and liquid pesticides, to a company known as Greenleaf, LLC ("Greenleaf"), for recycling purposes. Greenleaf operated a recycling facility in Neosho, Missouri, in the Western District of Missouri. On or about October 13, 2006, Wal-Mart formalized the relationship by entering into a contract with Greenleaf to receive, re-package and otherwise prepare certain household products, including the regulated pesticides, for reuse and resale.

Wal-Mart failed to adequately train its return center employees with regard to the required special handling of regulated pesticides sent to Greenleaf. As a result, employees did not provide proper oversight of the regulated pesticides sent to Greenleaf. Greenleaf would collect some of the solid pesticides received from Wal-Mart and mix them together in large bins. This mixture of pesticides was offered for sale to customers in containers that were not labeled with the required registration, ingredients, or use information for the pesticides.

On at least seventy different days between approximately July 2006, and February 2008, Wal-Mart sent truckloads of household products, including regulated pesticides, from its various return centers destined for and delivered to Greenleaf's facility in Neosho, Missouri. The amount of pesticides Wal-Mart shipped in this fashion during the relevant time period exceeded two million pounds. Wal-Mart shipped pesticides to Greenleaf knowing that Greenleaf was distributing them without the required registration, ingredients, or use information. In so doing, Wal-Mart aided and abetted Greenleaf in the distribution of pesticides without the required registration, ingredients, or use information, in violation of 7 U.S.C. § 136l(b)(1)(B). The

3

investigation did not uncover sufficient facts to prove or otherwise support the prosecution of individuals with the requisite knowledge and decision-making authority.

4. **Use of Factual Admissions.** The defendant acknowledges, understands, and agrees that the admissions contained in Paragraph three and other portions of this Plea Agreement will be used by the Court for the purpose of determining its guilt and an appropriate fine and sentence. The defendant acknowledges, understands and agrees that all other uncharged related criminal activity may be considered as "relevant conduct" in calculating the appropriate fine and sentence.

5. **Statutory Penalties.** The defendant understands that upon its plea of guilty to the Information the maximum fine the Court may impose under the statute charged is the greater of: (a) not more than $200,000 per count, (b) twice the gross pecuniary gain derived from the offense, or (c) twice the gross pecuniary loss caused to the victims of the offense, if any; a term of probation of not more than five (5) years, and a $125.00 mandatory special assessment which defendant agrees to pay in full at the time of sentencing.

6. **Agreements Pursuant to Rule 11(c)(1)(C).** The Government and the defendant agree that the following sentence is an appropriate disposition of this case:

      a.     A fine of eleven million dollars ($11,000,000) should be assessed against the defendant for the offense in the Information, and all relevant conduct arising from defendant's relationship and conduct with Greenleaf, as described in Paragraph three above, which occurred between July 2006 and February 2008. The criminal fine will be paid within seven days of the entry of judgment.

      b.     The defendant should be placed on unsupervised probation for a period of three (3) years, as provided by Section 8B2.1 of the United States Sentencing Guidelines. The probation shall exclude the standard conditions of probation imposed in this district, but shall include the following special condition of probation: the defendant shall comply with the requirements of a Civil Agreement and Final Order ("CAFO") with the USEPA filed May 28, 2013, which is attached as Exhibit A and incorporated into this Plea Agreement. The

4

CAFO provides for the establishment, implementation and operation of an enhanced environmental compliance program designed to promote the safe handling and transporting of pesticides, hazardous materials and hazardous waste ("Compliance Program"). The CAFO is for a term of five years from the date of entry of the CAFO and includes additional civil penalties against defendant. The Compliance Program will include specific operation, safety, and training procedures, to ensure that pesticides, hazardous materials, and hazardous waste are properly handled, transported, and managed pursuant to regulations promulgated under federal and state law. The implementation and operation of the Compliance Program, as well as defendant's continued compliance with environmental laws, will be overseen by the USEPA. In the event that the government concludes that the defendant has violated probation, the government will provide defendant with written notice detailing the basis for the alleged violation. Defendant shall be given ten business days to correct the alleged violation and provide a written response to the government. After evaluation of defendant's response, the government will determine, in its sole discretion, whether or not the alleged violation should be noticed to the Court.

      c.     In furtherance of satisfying the sentencing principles provided for under 18 U.S.C. § 3553(a), the defendant agrees to perform community service pursuant to Section 8B1.3 of the United States Sentencing Guidelines. The goal of the defendant's community service is to fund programs that promote and facilitate the proper management of pesticides. The parties agree that the defendant will make a community service program payment in the amount of three million dollars ($3,000,000) to the Missouri Department of Natural Resources ("MDNR") Hazardous Waste Program which shall be deposited into the Hazardous Waste Fund. The monies shall be used to fund a Statewide Pesticide Inspection and Education Initiative. The initiative includes hiring environmental specialist positions to conduct FIFRA training, including the production of guidance documents for department staff, the public, and regulated community, and to conduct and coordinated FIFRA enforcement activities. The defendant understands and agrees that any community service it provides as a result of this Agreement is not a charitable effort and agrees that it will not describe the community service as charitable effort or take any deduction or tax benefit associated with providing the community service. The community service program payment will be paid within seven days of the entry of judgment by check made payable to the MDNR Hazardous Waste Fund and sent to the attention of the General Counsel for the MDNR.

      7.    **Sentencing Procedures.**    The Government and defendant acknowledge,

understand and agree to the following:

      a.     In determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United

5

States Sentencing Commission; these Guidelines, however, are advisory in nature. The defendant understands that the United States Sentencing Guidelines relating to the sentencing of organizations do not apply to the imposition of fines for environmental crimes. U.S.S.G. § 8C2.1.

b.     The parties understand and agree that this Plea Agreement is entered into and is to be controlled by Federal Rule of Criminal Procedure 11(c)(1)(C). Accordingly, the parties understand and agree that: (a) if the Court accepts this Plea Agreement, the parties and the Court are bound by the terms of this Plea Agreement; and (b) if the Court does not accept this Plea Agreement, then (i) any party may withdraw from the Plea Agreement and that withdrawal will render this Plea Agreement null and void, (ii) defendant may elect to withdraw any guilty plea previously entered pursuant to this Plea Agreement, and (iii) should defendant elect such withdrawal, the parties shall be restored to their respective claims and defenses prior to the entry of such guilty plea.  The parties, having waived a pre-sentence report, request that the Court accept this Plea Agreement and sentence defendant at the time of defendant's entry of its guilty plea.

c.     The parties agree, subject to approval of the Court, that there is in the record information sufficient to enable a meaningful exercise of sentencing authority under 18 U.S.C. § 3553.  Thus, pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A)(ii), the parties request that the Court waive the preparation of a pre-sentence report in this matter; and that sentencing be held at the time the guilty plea to the Information is entered.

d.     Restitution is not applicable in this case, and the fine and community service payments imposed herein should represent the full extent of monetary penalties to be imposed on defendant pursuant to this Plea Agreement. Furthermore, defendant expended $3,419,000 million to properly remove and dispose of all materials from Greenleaf's facilities.

8.     **Government's Agreements**. Based upon the evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri and the Environmental Crimes Section, United States Department of Justice, as part of this Plea Agreement, agrees not to further prosecute defendant or any of its current  or former employees, officers, directors, agents, attorneys, or any of its subsidiaries, affiliated entities, or assignees for any violations of federal criminal law arising out of conduct relating to Greenleaf during the period of in or about July 2006 through in or about February 2008 as described in Paragraph three of this Plea Agreement, within the scope of the Information referenced in Paragraph two of this Plea Agreement, and occurring

6

prior to the execution of this Plea Agreement. This provision is binding on the United States Attorney's Office for the Western District of Missouri, the other 92 United States Attorney's Offices (the "other USAOs"), and the Environmental Crimes Section of the Environment and Natural Resources Division, United States Department of Justice ("ECS"). Defendant understands and agrees that the United States Attorney's Office for the Western District of Missouri, ECS, and the other USAOs, are free to prosecute defendant or any of the aforementioned persons or entities for any other unlawful past conduct not specifically exempted by this Agreement or any illegal conduct that occurs after the date of this Plea Agreement.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this Plea Agreement. If the defendant breaches this Plea Agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives its right to challenge the initiation of the dismissed or additional charges against for such breach of this Plea Agreement. The defendant expressly waives its right to assert a statute of limitations defense if the dismissed or additional charges as to which the applicable limitations period had not already expired as of the date that both the defendant and the Government signed this Plea Agreement are initiated against defendant following a breach of this Plea Agreement. The defendant further understands and agrees that if the Government elects to file additional charges or proceed with the original charges against it following a breach of this Plea Agreement that: (1) any statements made by the defendant's representative, under oath, at the guilty plea hearing (if such hearing occurred prior to the breach); (2) the Factual Basis in this Plea Agreement; and (3) any evidence lawfully derived from such statements, are admissible against defendant in any such prosecution or action against defendant, and defendant shall not assert any claim under the United States Constitution, Rule 410 of the

7

Federal Rules of Evidence, or Rule 11(f) of the Federal Rules of Criminal Procedure that the statements or evidence derived from any statements should be suppressed or are inadmissible.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible.

10. **Government's Reservation of Rights.** The defendant understands that, provided its actions are consistent with the provisions of this Plea Agreement, the United States expressly reserves the right in this case to: oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this Plea Agreement; comment on the evidence supporting the charges in the Information; oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed; and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and oppose any post-conviction motions for reduction of sentence, or other relief.

11. **Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that it has been advised of, understands, and knowingly and voluntarily waives the following rights:

        a.     the right to plead not guilty and to persist in a plea of not guilty;

        b.     the right to be presumed innocent until its guilt has been established beyond a reasonable doubt at trial;

        c.     the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

8

d.     the right to confront and cross-examine the witnesses who testify against it;

e.     the right to compel or subpoena witnesses to appear on its behalf; and

f.     the right to remain silent at trial, in which case its silence may not be used against it.

The defendant understands that by pleading guilty, it waives or gives up those rights and that there will be no trial. The defendant further understands that if it pleads guilty, the Court may ask its representative questions about the offense to which it has pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, its answers may later be used against it in a prosecution for perjury or making a false statement.

12.     **Waiver of Appellate and Post-Conviction Rights.**

a.     The defendant acknowledges, understands and agrees that by pleading guilty pursuant to this Plea Agreement it waives its right to appeal or collaterally attack a finding of guilt following the acceptance of this Plea Agreement.

b.     The defendant expressly waives its right to appeal its sentence, directly or collaterally, on any ground except a sentence imposed in excess of the statutory maximum or an illegal sentence, that is, sentencing error more serious than a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal its sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this Plea Agreement.

13.     **Waiver of FOIA Request.**   The defendant waives all of its rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

9

14. **Waiver of Claim for Attorney's Fees.** The defendant waives all of its claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

15. **Defendant's Representations.** The defendant acknowledges that it has entered into this Plea Agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that it is satisfied with the assistance of counsel, and that counsel has fully advised it of its rights and obligations in connection with this Plea Agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this Plea Agreement, have been made by the United States, the Court, its attorneys or any other party to induce it to enter its plea of guilty.

16. **No Undisclosed Terms.** The United States and defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire Plea Agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' Plea Agreement and will not be enforceable against either party.

17. **Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this Plea Agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this Plea Agreement.

10

18. **Corporate Authorization.** The authorized corporate officer who signs this Plea Agreement represents that he/she is authorized to enter into this Plea Agreement on behalf of the defendant, that all corporate requirements have been observed to permit the authorized representative, who must be a high level corporate officer, to enter a plea on behalf of the defendant to the one count Information in this matter, and that he/she will appear, along with corporate counsel, to enter the guilty plea and for the imposition of the sentence.

Tammy Dickinson
United States Attorney

Dated: May 28, 2013     By:    _s/ Phillip Eugene Porter_____

Phillip Eugene Porter
Deputy United States Attorney
Criminal Division Chief

Ignacia S. Moreno
Assistant Attorney General
Environment and Natural Resources Division

Dated: May 28, 2013     By:    _s/ Jennifer A. Whitfield_____

Jennifer A. Whitfield
Senior Trial Attorney
Environmental Crimes Section
P.O. Box 7611
Washington, D.C. 20044

11

I am authorized to execute this Plea Agreement on behalf of defendant Wal-Mart Stores, Inc. I have read this plea agreement and carefully reviewed every part of it with the attorney who represents said corporate defendant. After consultation with the attorney who represents defendant Wal-Mart Stores, Inc., I am authorized to represent, on behalf of Wal-Mart Stores, Inc, that it fully understands all the rights of said corporation with respect to the offense charged in the Information; fully understand the rights of said corporation with respect to the provisions of the Sentencing Guidelines; fully understands all the provisions of this Plea Agreement; and, knowingly and voluntarily agrees to this Plea agreement.

Dated: May 28, 2013           _s/ Kenneth Woodlin_____
                              For Wal-Mart Stores, Inc., Defendant
                              By: Kenneth Woodlin
                              Title: VP–Compliance, Safety and Asset Protection

I am defendant Wal-Mart Stores, Inc.'s attorney. I have fully explained to Wal-Mart Stores, Inc., its rights with respect to the offense charged in the Information. Further, I have reviewed with it the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this Plea Agreement with Wal-Mart Stores, Inc. To my knowledge, Wal-Mart Stores, Inc.'s decision to enter into this Plea Agreement is an informed and voluntary one.

Dated: May 28, 2013           _s/ James L. Eisenbrandt_____
                              James L. Eisenbrandt
                              Berkowitz Oliver Williams Shaw & Eisenbrandt
                              2600 Grand Blvd., Suite 1200
                              Kansas City, Missouri 64108
                              Attorney for Defendant

F i l e d

MAY 2 8 2013

Clerk, Environmental Appeals Board
INITIALS

IN THE MATTER OF )
)
)
)
)
Wal-Mart Stores, Inc. )
702 SW 8th Street, )
Bentonville, AR 72716-8611 )
)
)
)
)
)
RESPONDENT )

EPA Docket Nos.
RCRA-HQ-2013-4001
FIFRA-HQ-2013-5056

Proceeding Under Section 3008(a) of the
Resource Conservation and Recovery Act,
42 U.S.C. § 6928(a); Section 14(a) of the
Federal Insecticide, Fungicide and
Rodenticide Act, as amended, 7 U.S.C.
§ 136*l*(a)

**CONFIDENTIAL BUSINESS INFORMATION REDACTED – A complete copy of the document
has been filed with the Environmental Appeals Board Hearing Clerk**

## CONSENT AGREEMENT AND FINAL ORDER

Complainant, United States Environmental Protection Agency ("EPA"), and Respondent, Wal-

Mart Stores, Inc. ("Walmart") have agreed to settle this action and consent to the entry of this Consent

Agreement and Final Order ("CAFO") before taking testimony and without any adjudication of any

issues of law or fact herein.

### I. NATURE OF THE ACTION

1. This is a civil administrative action instituted under Section 3008(a) of the Solid Waste Disposal

   Act, as amended by the Resource Conservation Recovery Act of 1976 and the Hazardous and

   Solid Waste Amendments of 1984 (HSWA) (collectively "RCRA"), 42 U.S.C. § 6928(a);

   Section 14(a) of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "the Act"),

   as amended, 7 U.S.C. § 136*l*(a); and the Consolidated Rules of Practice Governing the

   Administrative Assessment of Civil Penalties and the Revocation/Termination or Suspension of

   Permits ("Consolidated Rules"), 40 C.F.R. Part 22 (2010). This action orders injunctive relief

   and civil penalties pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and Section 14(a)

   of FIFRA, 7 U.S.C. § 136*l*(a).

1


EXHIBIT
A

2. The Consolidated Rules provide that where the parties agree to settlement of one or more causes of action before the filing of a complaint, a proceeding may be simultaneously commenced and concluded by the issuance of a CAFO. 40 C.F.R. §§ 22.13(b) and 22.18(b)(2).

3. Complainant and Respondent have conferred for the purpose of settlement pursuant to 40 C.F.R. § 22.18, and desire to settle this action. Accordingly, before any testimony has been taken upon the pleadings and without any admission of violation or adjudication of any issue of fact or law, and in accordance with 40 C.F.R. § 22.13(b), Complainant and Respondent have agreed to the execution of this CAFO. Respondent hereby agrees to comply with the terms of this CAFO.

## II. THE PARTIES

4. Rosemarie A. Kelley, Director, Waste and Chemical Enforcement Division, Office of Civil Enforcement, Office of Enforcement and Compliance Assurance, is authorized, by lawful delegation, to institute and settle civil administrative actions brought pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and Section 14(a) of FIFRA, 7 U.S.C. § 136*l*(a).

5. Respondent is Wal-Mart Stores, Inc. ("Walmart" or "Respondent"), a Delaware corporation doing business in the State of Arkansas, as well as any subsidiaries or affiliated companies of Walmart in all 50 states.

## III. PRELIMINARY STATEMENTS

6. The terms of this CAFO constitute a full and final settlement between the parties for all claims for civil penalties and injunctive relief pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and Section 14(a) of FIFRA, for the alleged violations of RCRA and FIFRA specified in Section XI of this CAFO. Except as provided in paragraph 111, compliance with this CAFO shall not be a defense to any other action arising out of Walmart's future conduct and commenced pursuant to federal, state, and local environmental laws and it is the responsibility of the Respondent to comply with all applicable provisions of RCRA, FIFRA, and any other

2

federal, state, or local laws and regulations. Nothing in this CAFO is intended to nor shall be

construe to operate in any way to resolve any criminal liability of the Respondent.

7. Respondent admits the Stipulated Facts in Section VII of this CAFO. 40 C.F.R. § 22.18(b).

8. Respondent agrees to pay the civil penalties specified in Section XIII as full and final settlement

for all civil claims specified in this CAFO. 40 C.F.R. § 22.18(b).

9. Each party to this CAFO shall bear its own costs and attorneys' fees in the action resolved by

this CAFO.

## IV. JURISDICTION AND WAIVER OF RIGHT TO HEARING

10. This CAFO is entered into pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); Section

14(a) of FIFRA, 7 U.S.C. § 136*l*(a); and the Consolidated Rules, 40 C.F.R. Part 22.

11. Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, the Administrator of the EPA may

authorize a state to administer the RCRA hazardous waste program in lieu of the federal

program, when the Administrator finds that the state program meets certain conditions. Any

violation of regulations promulgated pursuant to Subtitle C of RCRA, 42 U.S.C. §§ 6921-

6939(e), or of any state provision authorized pursuant to Section 3006 of RCRA, 42 U.S.C. §

6926, constitutes a violation of RCRA, subject to the assessment of civil penalties and issuance

of compliance orders as provided by Section 3008 of RCRA, 42 U.S.C. § 6928.

12. Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, the Affected States have been authorized

to administer the base RCRA hazardous waste program (requirements imposed by the Solid

Waste Disposal Act prior to the Hazardous and Solid Waste Amendments of 1984) in lieu of the

federal government's program.

13. The violations of RCRA described herein are alleged to have occurred in all Affected States and

this compliance agreement covers Walmart Retail Facilities, Return Centers, and Distribution

Centers in all Affected States, so citations to federal RCRA regulations are used for the parties'

convenience. Respondent agrees that the terms of this compliance agreement govern its actions

3

but that States may impose requirements broader in scope than the federal regulations and this CAFO.

14. Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a) the Administrator may issue an order assessing a civil penalty for any past or current violation and require compliance immediately or within a specified time period.

15. Pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), EPA may enforce federally-authorized hazardous waste programs for violations of any requirement of Subtitle C of RCRA, Sections 3001-3023e, 42 U.S.C. §§ 6921-6939e.

16. Section 3006 of RCRA, 42 U.S.C. § 6926, as amended, provides, *inter alia*, that authorized state hazardous waste programs are carried out under Subtitle C of RCRA. Therefore, a violation of any requirement of law under an authorized state hazardous waste program is a violation of a requirement of Subtitle C of RCRA.

17. EPA has provided notice of commencement of this action to all authorized states pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

18. For the purpose of the CAFO, Respondent admits the jurisdictional allegations set out in this consent agreement and waives any defenses it might have to venue and jurisdiction. Solely for the purpose of the approval of this CAFO by the Environmental Appeals Board ("EAB"), Respondent agrees not to assert before the EAB any statute of limitations affirmative defense it might have for the RCRA and FIFRA violations alleged in Section XI.

19. Except as provided in paragraphs 7 and 18, above, Respondent neither admits nor denies the factual allegations and legal conclusions set out in this CAFO.

20. Respondent waives any right it may have to contest the allegations and its right to appeal the proposed Final Order accompanying this Consent Agreement for purposes of this CAFO only.

4

21. Respondent waives any right it may have to challenge the validity of this CAFO and the settlement of the matters addressed in this CAFO based on any issue related to the Paperwork Reduction Act.

22. Respondent waives any right it may have pursuant to 40 C.F.R. § 22.8 to be present during any discussions, with, or to be served with and reply to, any memorandum or communication addressed to EPA officials where the purpose of such discussion, memorandum or communication is to persuade such official to accept and issue this CAFO so long as the EPA Officials provide Respondent with notice and, if written, a copy of such memorandum or communication from any third party.

## V. PARTIES BOUND

23. This CAFO applies to and is binding upon the Complainant and the Respondent. Successors and assigns of Respondent are also bound if they are owned, in whole or part, directly or indirectly, by Respondent. Nothing in the previous sentence shall adversely affect any right of EPA under applicable law to assert successor or assignee liability against Respondent's successor or assignee, even if not owned in whole or in part, directly or indirectly, by Respondent.

24. Each Party certifies that at least one of its undersigned representatives is fully authorized by the Party whom he or she represents to enter into the terms and conditions of the CAFO, to execute it on behalf of that Party, and to legally bind the Party on whose behalf he or she signs this CAFO.

## VI. DEFINITIONS

25. Unless otherwise expressly provided herein, terms used in the CAFO that are defined in RCRA, 42 U.S.C. §§ 6902-6991i, or in regulations promulgated under RCRA, 40 C.F.R. Parts 260-270, or in a state's authorized hazardous waste program, shall have the same meaning assigned to them in RCRA or in such regulations or applicable authorized state hazardous waste program. Terms used in this CAFO that are defined in FIFRA, 7 U.S.C. §§ 136-136y, or in regulations

5

promulgated under FIFRA at 40 C.F.R. Parts 152-169, shall have the same meaning assigned to them in FIFRA or in such regulations.

26. Whenever terms listed below are used in this CAFO, the following definitions shall apply:

    a. "Affected State" shall mean a state in which a Walmart Retail Facility is located as specified in Appendix C of this CAFO.

    b. "Business Day" means any day other than Saturday, Sunday, or a federal or legal holiday.

    c. "Claims Supervisor" means a Walmart Retail Facility Associate as described in Paragraph 94(d) and assigned the title claims supervisor (or similar title) for Stores. Claims Supervisors' job responsibilities will include accountability for hazardous waste management issues.

    d. "Conditionally Exempt Small Quantity Generator" means a facility that generates less than 100 kg of hazardous waste in a calendar month.

    e. "Consent Agreement and Final Order" or "CAFO" shall mean this Consent Agreement and attached Final Order and all Attachments hereto. In the event of conflict between this Consent Agreement and any Attachment, this Consent Agreement shall control.

    f. "Consumer Products" shall mean products sold in consumer product packaging which are transported as part of the Reverse Distribution Process.

    g. "Clubs" means the members-only retail facilities operated by Wal-Mart Stores, Inc. under the name Sam's Club, or any future such facility.

    h. "Distribution Center" means a distribution center facility, or any future such facility, operated by Walmart for the distribution of new products from vendors to Walmart's Retail Facilities.

    i. "EPA" means the U.S. Environmental Protection Agency.

    j. "Establishment" means "any place where a pesticide or device or active ingredient used in producing a pesticide is produced, or held, for distribution or sale," 7 U.S.C. § 136(dd).

6

k. "FIFRA" means the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*

l. "Large Quantity Generator" means a facility that generates 1000 kg or more of hazardous waste in a calendar month.

m. "Notify" and "Submit" and other terms signifying an obligation to transmit or communicate documents and information mean to deliver in person, deposit in the U.S. mail or dispatch by express courier not later than the day that such transmission or communication is required by this CAFO. If that day is not a business day then the delivery, deposit, or dispatch shall be made the next business day.

n. "Paragraph" shall mean a portion of this CAFO identified by an arabic numeral and, in some cases, an associated lower case letter.

o. "Parties" shall mean U.S. EPA and Respondent.

p. "Pesticidal product" means "a pesticide, active ingredient, or device." 40 C.F.R. § 167.3.

q. "Pesticide" means, in relevant part, "(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer … ." 7 U.S.C. § 136(u).

r. "Pesticide product" means, in relevant part, "a pesticide in the particular form (including composition, packaging, and labeling) in which the pesticide is, or is intended to be, distributed or sold. …" 40 C.F.R. § 152.3.

s. This paragraph intentionally left blank.

t. "RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*

7

u. "Respondent" shall mean Wal-Mart Stores, Inc. and its successors and assigns, as well as any subsidiaries or affiliated companies of Walmart.

v. "Responsible Official" means an official of Walmart who is in charge of a principal business function, or any other person who performs similar policy or decision-making functions for Walmart.

w. "Return Center" means the six reverse distribution facilities operated by Walmart or on Walmart's behalf and located in Bentonville, Arkansas; Las Vegas, Nevada; Waco, Texas; Spartanburg, South Carolina; Indianapolis, Indiana; and Johnstown, New York; the facility previously located in Macon, Georgia, and any future such facility utilized as part of the Reverse Distribution Process or any new location for an above identified facility.

x. "Reverse Distribution Process" or "Reverse Distribution System" means a process for consolidating returned, recalled or other items in centralized Return Centers from Retail Facilities and Distribution Centers, one of the purposes of which is waste minimization through bulk resale of items, donation of items, return to manufacturer, or proper handling as waste. The items transported to a Return Center may have first been transported through a Distribution Center and consolidated prior to transfer to the Return Center.

y. "Retail Facility Associate" means a Walmart Retail Facility employee.

z. "Section" shall mean a portion of this CAFO identified by a roman numeral.

aa. "Small Quantity Generator" means a facility who generates more than 100 kg and less than 1000 kg of hazardous waste in a calendar month.

bb. "Solid Waste" shall mean any discarded material that is not excluded by 40 C.F.R. § 261.4(a) or that is not excluded by variance granted under §§ 260.30 and 260.31. For purposes of this CAFO with specific respect to Walmart Retail Facilities, discarded material means all Consumer Products under Respondent's control that cannot be sold at a Walmart Retail Facility or used by Walmart, and for which Respondent does not have a contractual

8

agreement or general practice providing for the return of that material to the manufacturer (readily confirmed by a written agreement with the manufacturer or business records maintained by the Respondent documenting routine returns of the material to the manufacturer), or the material otherwise cannot be donated, resold, reused, or recycled in a manner that does not constitute discard pursuant to 40 C.F.R. § 261.2 or applicable state law, or which the donation, resale, reuse, or recycling is prohibited under other applicable federal or state law.

cc. "Stores" means Walmart Discount Stores and Supercenters, or any future such Walmart Retail Facility (but not including Clubs as defined above).

dd. "United States" means the United States of America, and all of its departments, agencies, and instrumentalities.

ee. "Walmart Retail Facility" or "Retail Facility" means the Walmart owned retail facilities in the United States (including Puerto Rico and other U.S. territories), which includes Walmart Discount Stores, Supercenters, Neighborhood Markets, Sam's Clubs, and Marketside Stores or any future such facility. However, Walmart Retail Facility does not include any small format Walmart owned retail facility opened after January 1, 2011, that totals less than 30,000 sq. ft. in retail space. Nothing in this CAFO relieves Respondent from its obligation to comply with all applicable federal, state, and local statutes and regulations for all such small format Walmart owned retail facilities.

## VII. STIPULATED FACTS

27. Complainant is the Director, Waste and Chemical Enforcement Division, Office of Civil Enforcement, U.S. EPA.

28. Respondent is Wal-Mart Stores, Inc. (Walmart). Walmart's corporate office is located at 702 SW 8th Street, Bentonville, AR 72716-8611. Walmart operates approximately 4000 retail facilities throughout all fifty (50) states in the United States.

9

## VIII. RCRA LEGAL BACKGROUND

29. In 1976, Congress enacted RCRA, amending the Solid Waste Disposal Act, to regulate hazardous waste management. RCRA Subtitle C, 42 U.S.C. §§ 6921 *et seq.*, empowers EPA to identify and list hazardous wastes. It also authorizes EPA to regulate hazardous waste generators, transporters, and the owners and operators of hazardous waste treatment, storage, and disposal facilities. EPA has promulgated regulations to implement RCRA Subtitle C, which are set forth at 40 C.F.R. Parts 260-270, 273, and 279.

30. Pursuant to Section 3001 of RCRA, 42 U.S.C. § 6921, EPA promulgated regulations to define what materials are "solid wastes," and of these solid wastes, what wastes are regulated as "hazardous wastes." These regulations and definitions are set forth at 40 C.F.R. Part 261.

31. Pursuant to 40 C.F.R. § 261.2, a "solid waste" is any discarded material that is not otherwise excluded by regulation or variance.

32. Regulations governing the identification of hazardous wastes are found in 40 C.F.R. Part 261. These regulations contain two (2) categories of hazardous wastes, "listed" and "characteristic." Those wastes that have been determined to be hazardous by definition have been assigned certain identification numbers and are referred to as "listed wastes." "Characteristic hazardous wastes" are solid wastes that exhibit one or more of the following characteristics: ignitability, reactivity, corrosivity or toxicity.

33. Section 3002 of RCRA, 42 U.S.C. § 6938, requires EPA to establish standards applicable to generators of hazardous wastes. These standards are codified at 40 C.F.R. Part 262 and include requirements for determining whether a waste is hazardous, managing waste in proper containers, labeling and dating containers, inspecting waste storage areas, training, planning for emergencies, and procedures and requirements related to shipping wastes off-site for treatment, storage, or disposal.

## IX. FIFRA LEGAL BACKGROUND

34. FIFRA grants the Agency authority to regulate the production, distribution, sale, labeling, and application of pesticides. Pursuant to 7 U.S.C. § 136j(a)(2)(L), no person shall produce any pesticide unless the establishment in which it is produced is registered with EPA under Section 7(a) of FIFRA, 7 U.S.C. § 136e(a). Pursuant to 7 U.S.C. § 136j(a)(1)(E) and (C), respectively, with certain exceptions not applicable to this CAFO, it is unlawful for any person to distribute or sell, *inter alia*: a) any pesticide which is adulterated or misbranded; and b) any registered pesticide the composition of which differs at the time of its distribution or sale from its composition as described in the statement required in connection with its registration under 7 U.S.C. § 136a. It is unlawful for any person to detach, alter, deface, or destroy any labeling required under FIFRA. 7 U.S.C. § 136j(a)(2)(A).

## X. EPA ALLEGATIONS AND DETERMINATIONS

35. Respondent, Wal-Mart Stores, Inc. is a "person" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15), Section 2(s) of FIFRA, 7 U.S.C. § 136(s), and 40 C.F.R. § 260.10;

36. Respondent operates retail grocery and department stores in various formats across the United States at which Walmart sells commonly used consumer products.

37. Respondent sells common consumer products, some of which may be considered hazardous waste (when discarded) under federal or state law, including but not limited to, bleaches, pool chlorine and acids, pesticides, fertilizers, paints and varnishes, lamp oil and other ignitable liquids, aerosol products, oven cleaners and various other cleaning agents, automotive products and solvents, and other flammable and corrosive materials. Most of these consumer products are sold to the public in the ordinary course of business.

38. If these common consumer products are spilled or leaking or in a condition such that they cannot be used for their intended purpose, sold, or recycled, some of these products may be considered hazardous waste under federal or state law. Prior to 2006, some of these hazardous wastes were

11

then sent by the Retail Facilities to one (1) of six (6) Walmart Return Centers to determine final disposition.

39. Respondent is the owner and operator of approximately 4000 Walmart Retail Facilities and Distribution Centers, of which, on a monthly basis, a very large majority may be Conditionally Exempt Small Quantity Generators ("CESQG") of hazardous waste, pursuant to 40 C.F.R. § 261.5.

40. Prior to 2006, Walmart Retail Facilities that generated more than 100 kg of hazardous waste per month did not systematically determine if Solid Wastes were hazardous waste as required by 40 C.F.R. § 262.11, and where such waste was hazardous, did not systematically handle the hazardous waste in accordance with the requirements of 40 C.F.R. Part 262.

41. Prior to 2006, Respondent did not prepare manifests for shipment of these wastes to the Return Centers.

42. Prior to 2006, some of the returned or damaged products Walmart shipped to its Return Centers on Walmart trucks were hazardous waste. Walmart trucks are not authorized to transport hazardous waste, as defined in 40 C.F.R. Part 263.

43. Walmart's Return Centers are not designated hazardous waste treatment, storage or disposal facilities under RCRA and are not authorized to accept hazardous waste.

Prior to 2006, Respondent did not have a proper employee training plan in place at the Retail Facilities, as required by 40 C.F.R. Part 262 nor did Respondent have emergency procedures in place.

44. This paragraph intentionally left blank.

45. A majority of the Respondent's Retail Facilities typically generate less than 100 kg of hazardous waste per month, and therefore, are subject only to the RCRA regulatory requirements applicable to Conditionally Exempt Small Quantity Generators ("CESQGs") at 40 C.F.R. § 261.5.

46. Walmart sells, at Wal-Mart Retail Facilities, among other things, a variety of pesticides and fertilizer-pesticide mixtures that are regulated under FIFRA.

47. On October 9, 2006, Walmart entered into a written agreement with an entity that became known as Greenleaf LLC, to receive, re-package and otherwise prepare certain household products, including regulated pesticides for reuse and re-sale.

48. On at least 70 days between, approximately, July 2006 and February 2008, Walmart sent truckloads of household products, including charcoal, kitty litter, and approximately two million pounds of solid and liquid pesticides from Walmart Return Centers destined for and delivered to Greenleaf's facility in Neosho, Missouri ("the Greenleaf facility"). At least nine pesticide products (see Appendix B) were included in the shipments described above. Respondent avers that the shipments to Greenleaf were intended for the purpose of re-packaging and re-sale in order to allow the useable products to be used for their intended purposes, thereby reducing waste.

49. Greenleaf did not, at the time of the violations alleged herein, have appropriate EPA FIFRA registrations, required pursuant to Section 3 of FIFRA, 7 U.S.C. § 136a, to mix, repackage, and relabel some of the pesticides that Walmart sent to the Greenleaf facility.

50. Walmart subsequently removed and disposed of all materials, including pesticides, from the Greenleaf facility under the supervision of the Missouri Department of Natural Resources.

51. In 2006, Respondent began to implement an enhanced environmental management program in all of its Retail Facilities which seeks to provide for the proper management of hazardous wastes

at all Walmart Retail Facilities and in many respects goes beyond mere compliance with environmental laws. This program is more fully described in Paragraph 93 of this CAFO.

52. Under the Respondent's current environmental management program, hazardous waste determinations are made at all Walmart Retail Facilities and hazardous wastes are picked up by licensed hazardous waste haulers and transported under a RCRA hazardous waste manifest to a hazardous waste treatment, storage, or disposal facility.

53. Respondent currently operates all Walmart Retail Facilities generally in compliance with the Small Quantity Generator requirements of 40 C.F.R. Part 262, even if the facility does not generate more than 100 kg of hazardous waste per month.

54. Respondent continues to operate a Reverse Distribution System for products that cannot, for various reasons, be sold in Walmart Retail Facilities. The Parties agree that the use of reverse distribution for the management of retail consumer products (wherein items are centralized for determining the most efficient use, re-use, or other disposition of the item), is an effective means of ensuring re-use, recycling, and waste minimization. The Parties acknowledge that for some Consumer Products sent to Return Centers a decision as to whether those products will be discarded can only be made at the Return Center, as reflected in the terms of this CAFO. This means that Return Centers do generate certain hazardous wastes. This agreement attempts to facilitate the effective use of the reverse distribution process while ensuring that those Consumer Products that clearly constitute hazardous wastes are managed in accordance with RCRA at Walmart's Retail Facilities.

## XI. VIOLATIONS

### Count 1: Failure to Make a Hazardous Waste Determination

55. Paragraphs 1 through 54 above are incorporated herein by reference as if they were set forth in their entirety.

14

56. 40 C.F.R. § 262.11 requires a person who generates a Solid Waste to determine if that waste is a hazardous waste.

57. Solid Waste is generated at Walmart Retail Facilities. From January 1, 2005 until January 1, 2006, Respondent, before shipping Solid Wastes to Return Centers, failed to make hazardous waste determinations at any of its Walmart Retail Facilities.

58. By failing to determine whether the Solid Waste generated at Walmart Retail Facilities was a hazardous waste, Respondent violated 40 C.F.R. § 262.11.

**Count 2: Failure to Prepare a Hazardous Waste Manifest**

59. Paragraphs 1 through 58 above are incorporated herein by reference as if they were set forth in their entirety.

60. 40 C.F.R. § 262.20 requires any generator who generates more than 100 kg of hazardous waste per month and who transports or offers for transport hazardous waste to prepare a manifest.

61. From January 1, 2005 until January 1, 2006, Respondent failed to prepare a manifest for each shipment of hazardous waste requiring such a manifest from Walmart Retail Facilities to its Return Centers.

62. By failing to prepare a manifest for each shipment of hazardous waste requiring such a manifest from Walmart Retail Facilities, Respondent violated 40 C.F.R. § 262.20.

**Count 3: Offering Hazardous Waste to Un-permitted Treatment, Storage, or Disposal Facility**

63. Paragraphs 1 through 62 above are incorporated herein by reference as if they were set forth in their entirety.

64. From January 1, 2005 until January 1, 2006, Respondent transported hazardous waste from its Retail Facilities to its Return Centers.

15

65. From January 1, 2005 until January 1, 2006, the transporter did not have an EPA identification number and the Return Centers were not authorized hazardous waste treatment, storage, or disposal facilities with valid EPA identification numbers.

66. By offering its hazardous waste to transporters and hazardous waste treatment, storage or disposal facilities that did not have valid EPA identification numbers, Respondent violated 40 C.F.R. § 262.12.

## Count 4:  Failure to Meet Hazardous Waste Handling, Storage, and Emergency Response Requirements

67. Paragraphs 1 through 66 above are incorporated herein by reference as if they were set forth in their entirety.

68. From January 1, 2005 until January 1, 2006, Respondent accumulated hazardous waste at its Retail Facilities in unmarked and undated containers.

69. From January 1, 2005 until January 1, 2006, Walmart Retail Facilities did not comply with the emergency planning procedures and training requirements pursuant to 40 C.F.R. § 262.34(d).

70. By accumulating hazardous waste in unmarked and undated containers and failing to have implemented the required emergency planning procedures and employee training, Respondent did not meet the conditions for an exemption from permit requirements under 40 C.F.R. § 262.34.  Therefore, Respondent failed to qualify for an exemption from the permit requirements and violated RCRA § 3005(a) and 40 C.F.R. § 270.1 by storing containers of hazardous wastes without a permit to store such waste, or interim status.

## Count 5:  Detachment and/or alteration of pesticide labels in violation of FIFRA Section 12(a)(2)(A)

71. Paragraphs 1 through 70 above are incorporated herein by reference as if they were set forth in their entirety.

Case 4:13-cr-00135-JTM   Document 2   Filed 05/28/13   Page 28 of 60

72. Section 12(a)(2)(A) of FIFRA, 7 U.S.C. § 136j(a)(2)(A), provides that it shall be unlawful for any person to detach, alter, deface, or destroy, in whole or in part, any labeling required under FIFRA.

73. Respondent repackaged or otherwise changed the FIFRA-required labeling of at least two pesticide products, which were handled at its Return Centers and shipped to or destined for the Greenleaf facility on each of at least 70 days between July 1, 2006 and January 30, 2008, as alleged in paragraph 48 above.

74. As a result of damage to certain containers and Respondent's changes to the packaging or labeling of pesticide products as alleged in paragraph 73, the labeling, required under FIFRA and 40 C.F.R. § 156.10(a), on one or more containers of at least two pesticides, which were shipped to or destined for the Greenleaf facility in Neosho, Missouri from Respondent's Return Centers on each of at least 70 days between July 1, 2006 and January 30, 2008, was, in whole or in part, detached, altered, or obscured by opaque outer wrappers or containers that Respondent placed over some of the damaged containers.

75. By covering, detaching, altering, or otherwise changing, in whole or in part, the labeling on the containers of at least two pesticide products, which were shipped to or destined for the Greenleaf facility from Respondent's Return Centers on each of at least 70 days between July 1, 2006 and January 30, 2008, as alleged in paragraphs 73 and 74, above, Respondent violated Section 12(a)(2)(A) of FIFRA, for which penalties may be assessed pursuant to Section 14(a) of FIFRA, 7 U.S.C. § 136*l*(a).

## Count 6: Distribution of misbranded pesticidal products in violation of Section 12(a)(1)(E) of FIFRA

76. Paragraphs 1 through 75 above are incorporated herein by reference as if they were set forth in their entirety.

17

77. Section 12(a)(1)(E) of FIFRA, 7 U.S.C. § 136j(a)(1)(E), provides that it shall be unlawful for any person in any State to distribute or sell to any person any pesticide that is adulterated or misbranded.

78. Pursuant to Section 2(q)(1)(E) of FIFRA, 7 U.S.C. § 136(q)(1)(E), a pesticide is "misbranded" if, *inter alia*, any word, statement, or other information required by or under authority of FIFRA to appear on the label or labeling is not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

79. Section 2(q)(2)(A) of FIFRA, 7 U.S.C. § 136(q)(2)(A), provides, in relevant part, a pesticide is "misbranded" if, *inter alia*, the label does not bear an ingredient statement on that part of the immediate container (and on the outside container or wrapper of the retail package, if there be one, through which the ingredient statement on the immediate container cannot be clearly read), which is presented or displayed under customary conditions of purchase.

80. Section 2(q)(2)(C) of FIFRA, 7 U.S.C. § 136(q)(2)(C), provides, in relevant part, a pesticide is "misbranded" if, *inter alia*, there is not affixed to its container, and to the outside container or wrapper of the retail package, if there be one, through which the required information on the immediate container cannot be clearly read, a label bearing the information enumerated in that paragraph.

81. Pursuant to 40 C.F.R. § 156.10(a)(1), pesticide products must bear labels containing the information specified by FIFRA and its implementing regulations. The contents of the label must show clearly and prominently, *inter alia*, the name, brand, or trademark under which the product is sold; the name and address of the producer, registrant, or person for whom produced; the net contents expressed in the units specified in 40 C.F.R. § 156.10(d); the product registration number; the pesticide producing establishment number; the ingredient statement (with the active ingredients identified by name and designated as "active ingredients" with their total percentage

18

by weight identified and inert ingredients designated collectively as "inert ingredients" with their total percentage by weight identified); a hazard and precautionary statement; directions for use of the pesticide; and use classification. The label must appear on or be securely attached to the immediate container of the pesticide product. 40 C.F.R. § 156.10(a)(4)(i).

82. As a result of damage to certain containers, and Respondent's changes to the packaging or labeling of pesticide products as alleged in paragraph 73, above, the labels on one or more containers of each of at least two pesticide products, which were shipped to or destined for the Greenleaf facility from Respondent's Return Centers on each of at least 70 days between July 1, 2006 and January 30, 2008, as alleged in paragraph 48, above, did not clearly display all of the information required by FIFRA and 40 C.F.R. § 156.10(a) or such labels could not be read because they were obscured by opaque outer wrappers or containers.

83. Section 2(q)(1)(A) of FIFRA, 7 U.S.C. § 136(q)(1)(A), provides that a pesticide is "misbranded" if its labeling bears any statement, design or graphic representation relative thereto or to its ingredients which is false or misleading in any particular.

84. Some of the containers of pesticides or pesticide products that Respondent shipped to Greenleaf's facility in Neosho, Missouri on at least 70 occasions between January 1, 2007 and January 30, 2008, as alleged in paragraph 48, above, contained quantities of pesticides that differed significantly from the quantities listed on the container labels.

85. For the reasons described in paragraphs 82 and 84, above, one or more containers of each of at least two pesticide products, which were shipped to or destined for the Greenleaf facility from Respondent's Return Centers on each of at least 70 days between July 1, 2006 and January 30, 2008, were "misbranded" as that term is defined in FIFRA § 2(q)(1)(A) and (E) and 2(q)(2)(A) and (C).

86. Respondent's distributions of at least two misbranded pesticides on at least 70 days between July 1, 2006 and January 30, 2008, as alleged in paragraphs 48, 82, and 84, above, were unlawful acts

19

under Section 12(a)(1)(E) of FIFRA, 7 U.S.C. § 136j(a)(1)(E), for which a penalty may be

assessed pursuant to Section 14(a) of FIFRA.

## XII.  RCRA COMPLIANCE AGREEMENT

Based on the foregoing Preliminary Statements, Allegations and Determinations, the Parties agree to the

following:

87.  Although a majority of Walmart Retail Facilities may qualify as CESQGs in any given month

(pursuant to 40 C.F.R. § 261.5), the hazardous waste management program implemented by

Respondent at Walmart Retail Facilities, as referenced in Paragraphs 87-95, generally seeks to

satisfy RCRA Small Quantity Generator requirements.  To the extent Consumer Products

continue to be subject to RCRA hazardous waste requirements when discarded, Walmart agrees

to:

    a.  As applicable, Respondent shall ensure that all Walmart Retail Facilities have an EPA

identification number, pursuant to 40 C.F.R. § 262.12.

    b.  At all Walmart Retail Facilities, Respondent will properly segregate and store all

hazardous wastes for no more than 180 days (270 days if the waste must be shipped more

than 200 miles to a treatment, storage, or disposal facility) and comply with all other

requirements applicable to Small Quantity Generators at 40 C.F.R. § 262.34.

    c.  Respondent shall properly package, label, mark, and placard all hazardous waste

shipments from Walmart Retail Facilities pursuant to 40 C.F.R.§§ 262.30 – 262.33.

    d.  Respondent shall comply with all manifest and related requirements for hazardous wastes

shipped from Walmart Retail Facilities pursuant to 40 C.F.R. §§ 262.20 – 262.27.

    e.  Respondent shall only use transporters that have an EPA identification number to

transport hazardous wastes from Walmart Retail Facilities.

    f.  Respondent shall send all hazardous wastes generated at Walmart Retail Facilities to

treatment, storage, or disposal facilities that have an EPA identification number.

20

g. Respondent shall maintain required records and submit required reports pursuant to 40 C.F.R. §§ 262.40 – 262.44.

88. If at any time a Walmart Retail Facility generates 1000 kg or more of hazardous waste in a calendar month or accumulates more than 6000 kg of hazardous waste, Respondent shall comply with all Large Quantity Generator requirements in 40 C.F.R. Part 262 with respect to that Walmart Retail Facility.

89. Respondent shall manage all hazardous wastes generated at Walmart Retail Facilities (as determined pursuant to Paragraph 91) as hazardous waste and will not send hazardous waste to its Distribution and Return Centers.

90. Respondent shall submit to EPA within sixty (60) days of the filing of this CAFO a current list of all Consumer Products that Respondent currently manages as hazardous waste at its Retail Facilities if those products are spilled, leaking, and cannot be used for their intended purpose in Walmart Retail Facilities ("RCRA Hazardous Item List"). This list shall be marked as and considered Confidential Business Information.

91. Respondent shall make hazardous waste determinations for all Solid Wastes, pursuant to 40 C.F.R. § 262.11. As a means of compliance with this requirement and for purposes of this CAFO only, Respondent shall implement a program to continuously monitor the management of hazardous waste at Walmart Retail Facilities. This program will address Consumer Product items sent to the Return Centers in quantities greater than 1000 items (by Walmart Item ID number), on an annual and nationwide basis. If this program identifies Consumer Product(s) managed as a hazardous waste more than 85% of the time at all Return Centers in the previous calendar year and Walmart has not identified an alternative method of management for those products, then those products will be managed as hazardous wastes at the Retail Facilities pursuant to this CAFO only. Respondent shall submit to EPA on January 31, 2014, and annually thereafter for the duration of this CAFO, a description of all products that as a result of this

21

review, Respondent will manage as hazardous waste in accordance with this CAFO. Respondent

shall submit this report on January 31 of each calendar year for as long as this CAFO is in effect,

with a reference to the RCRA docket number for this agreement, to the following person:

Rosemarie A. Kelley
Director, Waste and Chemical Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W. (MC 2249A)
Washington, DC 20460

92. At each Retail Facility, Respondent shall maintain a current database of all Consumer Products

that should be managed as hazardous waste pursuant to this agreement and shall make the

information available to any EPA or State official conducting a RCRA compliance inspection at

that Retail Facility. This database shall be the same or similar as the handheld terminal-type

system described in Paragraph 93(a).

93. As of the date of filing of this CAFO, Walmart has already taken steps to improve its

environmental compliance program to address the allegations in this CAFO and to ensure

compliance with all applicable environmental laws related to Walmart's Reverse Distribution

Processes and hazardous waste management. Generally, these steps include an improved

hazardous waste management system at Walmart Retail Facilities, development of enhanced

hazardous waste training programs for Walmart Retail Facility Associates, and the development

of various standardized operating procedures. Specifically, Walmart agrees to the following

programs that have been implemented in response to the allegations of the United States:

a.  Implementation of Improved Hazardous Waste Management System at Retail Facilities.

Walmart has engaged a third-party consultant to review the Consumer Products to be sold

at a Retail Facility and determine if those products, if discarded by Walmart, would be

considered hazardous waste pursuant to RCRA ("RCRA Items"). Once the RCRA Items

are identified, either through the third-party consultant or by the supplier(s) of the RCRA

Item, that information is then loaded into the Retail Facilities' handheld terminal (or

22

equivalent) and the RCRA Items are identified as being potentially flammable, toxic/corrosive, reactive, or listed pursuant to RCRA, in the Retail Facilities' handheld terminal and on the product's shelf label (each category designated by color). To the extent these RCRA Items become a waste (as the result of spills or damage at the Retail Facility), Walmart has implemented a system that conforms with the provisions of RCRA – commonly and currently known as the "bucket system." The bucket system provides training and color-coded buckets for the management of items that become hazardous waste at the Retail Facility. At Retail Facilities, Walmart will continue operation of its "RCRA item file" and "bucket system" (or equivalent file or systems) to ensure proper management of RCRA Items once they become Solid Waste during the term of this CAFO, to the extent the law continues to identify these items as subject to the hazardous waste requirements of RCRA.

b. <u>Development and Implementation of Enhanced Hazardous Waste Training at Retail Facilities.</u> Walmart has developed and implemented hazardous waste management and hazardous waste and spill cleanup training, as well as hazard communication training, that is provided to all Retail Facility Associates within sixty (60) days of hire and on an annual basis.

c. <u>Development of Standard Operating Procedures Relating to Environmental Compliance.</u> In order to assist its Retail Facilities in the management of various types of hazardous and universal waste, Walmart has developed and implemented standard operating procedures for use by Retail Facility Associates. These standard operating procedures are available and accessible to Retail Facility Associates through Walmart's intranet system. Appendix A contains the current list of hazardous material and hazardous waste related standard operating procedures implemented at the Stores and Clubs.

23

d. <u>Corporate Compliance Structure.</u> In addition to existing Walmart personnel with environmental compliance responsibilities within a particular home office department, Walmart has created a home office vice president position responsible for environmental compliance. Walmart has, when needed, increased the staffing resources of the Vice President of Environmental Compliance in order to oversee proper implementation of the above programs.

94. In addition to requiring continued operation of its hazardous waste management programs, a purpose of this CAFO is to require Walmart to implement an Environmental Management System (EMS) in all of its Retail Facilities located in the United States. This EMS will not only advance compliance with environmental regulatory requirements, including Walmart's management of hazardous materials and hazardous waste and reduction of waste generated from its Retail Facilities, but will also achieve enhanced compliance at Return Centers, and Distribution Centers. To that end, Walmart has agreed to implement enhanced EMS procedures. These enhanced procedures, detailed further in Appendix A, include the following:

a. <u>Reorganization of Walmart's Home Office Environmental Compliance Organization.</u> In order to provide increased resources and support structure to Walmart Retail Facilities, Walmart will reorganize its Home Office Environmental Compliance organization in order to ensure a uniform reporting structure under the Vice President of Environmental Health and Safety Compliance. The net effect of the reorganization will be a more uniform environmental command structure and improved environmental communications, resulting in a more robust organization available to address environmental compliance issues.

b. <u>Addition of Resources Outside of Home Office for Stores.</u> Walmart will implement resources outside of Home Office to assist Stores in compliance with hazardous waste and hazardous materials laws and regulations. These resources will be responsible for

24

executing, training, and overseeing the company's hazardous waste and hazardous materials policies at the store, market, and regional level of the Stores' business operations.

c.  Job Descriptions. In order to improve accountability, Walmart will add an explicit environmental compliance requirement to certain Walmart Retail Facility staff personnel job descriptions.

d.  Claims Supervisor for Stores. Walmart will assign a new claims supervisor (Claims Supervisor) position at each Store whose job responsibilities will include responsibility and accountability for hazardous waste management issues.

e.  Club-Level Manager for Sam's Clubs. Walmart will also create a new Manager position at each Club whose job responsibilities will include responsibility and accountability for hazardous waste management issues.

f.  Advanced Training for Certain Retail Associates. Walmart will develop and implement additional/advanced training requirements for Store Claims Supervisors and Club Compliance Managers.

g.  Tracking of Environmental Training at Stores and Clubs. Walmart will implement an improved information technology system to enable tracking of Core Environmental Training (as described in Paragraph 93(b) and Appendix A) and the Advanced Training for Certain Retail Associates (as described in Paragraph 94(f) and Appendix A) by the Home Office Environmental Compliance Organization.

h.  Environmental Compliance Information Systems. Walmart will contract with an independent third party (or use in-house resources) to develop environmental compliance information systems to be used to track environmental obligations at Retail Facilities.

i.  Development and Implementation of Return Center Hazardous Waste EMS and Distribution Center Hazardous Waste EMS. Walmart will contract with a third-party

25

> environmental compliance consultant for the development and implementation of a
> Return Center specific Hazardous Waste EMS. In addition, Walmart will contract with a
> third-party environmental compliance consultant for the development and
> implementation of a Distribution Center specific Hazardous Waste EMS.

95. Walmart will perform the EMS procedures as set forth in Paragraph 94 in accordance with the specifications and schedules set forth in Appendix A.

96. Respondent shall certify compliance to EPA with the appropriate documentation to certify that Respondent is complying with the requirements set forth in Paragraphs 87-95 above, within ninety (90) calendar days of the schedule provided for completion in Appendix A. The certification and supporting documentation should be provided to:

KC Schefski, Associate Director
Waste and Chemical Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W. (2249A)
Washington, DC 20460

97. Respondents shall be liable for stipulated penalties to the EPA, as specified below, for failure to comply with the requirements of this CAFO, unless excused by EPA in its sole discretion. Compliance by Respondent shall include the timely completion and submittal of all plans and reports required by this agreement or any subsequent modification. Respondent shall pay stipulated penalties in the following amounts for the following obligations in the amounts set forth below:

   a. for failure to timely submit reports, plans, notifications, or other submittals required in this CAFO or its Appendices;

   b. for failure to timely meet any deadlines set forth in the Resources, Systems, and Accountability Work Plan to be submitted pursuant to Appendix A;

26

    c.   for failure to develop a Retail Facility Associate training program that requires that Retail Facility Associates are trained on Walmart's hazardous waste management policies as provided in Paragraphs 4(a) and (b) of Appendix A;

    d.   for failure to timely implement the standard operating procedure for store-level hazardous waste management as provided by Paragraph 6 of Appendix A; or

    e.   for failure to select and retain an independent third party to develop a Return Center specific Hazardous Waste Environmental Management System as provided by Paragraphs 8-9 of Appendix A.

    f.   for failure to select and retain an independent third party to develop a Distribution Center specific Hazardous Waste Environmental Management System as provided by Paragraphs 10-11 of Appendix A.

| Period of Failure to Comply | Penalty Per Violation Per Day |
|---|---|
| 1st through 7th day | $100.00 |
| 8th through 21st day | $250.00 |
| 22nd through 30th day | $500.00 |
| Greater than 30 days | $1,000 |

98. Respondent's failure to timely comply with any requirement of this CAFO may subject Respondent to a civil action pursuant to Section 3008(c) of RCRA, 42 U.S.C. § 6928(c), to collect penalties for noncompliance with this CAFO.

99. Payment of stipulated penalties will not alter in any way Walmart's obligation to comply with the requirements of this CAFO.

100. Nothing in this CAFO relieves Respondent from its obligation to comply with all applicable federal, state, and local statutes and regulations, including Subtitle C requirements at 40 C.F.R. Parts 260 through 279, and authorized state programs, at all its facilities.

27

101. Nothing in this CAFO will require Respondent to meet more stringent requirements contained in this CAFO in the event that the applicable law becomes less stringent. Within 60 days of Walmart providing notice to EPA that applicable requirements have been modified by issuance of any new EPA final regulation (as promulgated in the Federal Register); policy or guidance governing hazardous waste management; upon EPA approval or promulgation of new or revised waste management standards; or upon the issuance of a permit that contains new requirements pertaining to Walmart's operations, Walmart may conform its practices to the less stringent obligations contained in the applicable new regulation, policy, new or revised standard or permit.

## XIII. PAYMENT OF CIVIL PENALTY

102. Respondent agrees to pay a civil penalty in the sum of $6,116,000 within thirty (30) calendar days of the effective date of this CAFO to resolve the RCRA violations alleged herein.

103. Respondent agrees to pay a civil penalty in the sum of $1,512,000 within thirty (30) calendar days of the effective date of this CAFO to resolve the FIFRA violations alleged herein.

104. The parties agree that the payment of the civil penalties specified in Paragraphs 102-103 resolves the civil penalty liability for the violations alleged herein.

105. Payment shall be made by cashier's check, certified check, or other payment acceptable to EPA, payable to: **Treasurer, United States of America**. EPA's Employer ID Number is 52-0852695. The facility name and the docket number for this matter shall be referenced on the face of the check. Payment shall be tendered via the U.S. Postal Service to:

> United States Environmental Protection Agency
> Fines and Penalties
> Cincinnati Finance Center
> P.O. Box 979077
> St. Louis, Missouri 63197-9000

Respondent shall submit a copy of the payment to the following addresses:

> U.S. Environmental Protection Agency
> Clerk of the Board
> Environmental Appeals Board

28

> Ariel Rios Building
> 1200 Pennsylvania Avenue, N.W.
> Washington, DC 20460-0001
>
> Ann Stephanos, Attorney-Adviser
> Office of Civil Enforcement
> U.S. Environmental Protection Agency
> 1200 Pennsylvania Ave., N.W. (MC 2249A)
> Washington, DC 20460

Alternatively, Respondent shall pay by wire transfer with a notation of "Wal-Mart Stores, Inc,

Civil Penalty Docket Nos. RCRA-HQ-2013-4001, FIFRA-HQ-2013-, using the following

information:

> Federal Reserve Bank of New York
> ABA Routing Number: 021030004
> Account Number: 68010727
> SWIFT address: FRNYUS33
> 33 Liberty Street
> New York, NY 10045
> Field Tag 4200 of the Fedwire message should read: "D 6810727 Environmental
> Protection Agency"

106. If Respondent fails to remit the civil penalty as agreed to herein, EPA is required to assess

interest and penalties on debts owed to the United States and a charge to cover the costs of

processing and handling the delinquent claim. Interest, at the statutory judgment rate provided

for in 31 U.S.C. § 3717, will therefore begin to accrue on the civil penalty if not paid within

thirty (30) calendar days after the effective date of this CAFO. Pursuant to 31 U.S.C. § 3717,

Respondent must pay the following amounts on any amount overdue:

(a) Interest. Any unpaid portion of a civil penalty must bear interest at the rate established by the

Secretary of the Treasury pursuant to 31 U.S.C. § 3717(a)(1). Interest will therefore begin to

accrue on a civil penalty or stipulated penalty if it is not paid by the last date required. Interest

will be assessed at the rate of the United States Treasury tax and loan rate in accordance with 4

C.F.R. § 102.13(c).

29

(b) <u>Monthly Handling Charge</u>.  Respondent must pay a late payment handling charge of $15.00 on any late payment, with an additional charge of $15.00 for each subsequent thirty (30) calendar day period over which an unpaid balance remains.

(c) <u>Non-payment Penalty</u>.  On any portion of a civil penalty more than ninety (90) calendar days past due, Respondent must pay a non-payment penalty of six percent per annum, which will accrue from the date the penalty payment became due and is not paid.  This non-payment is in addition to charges which accrue or may accrue under subparagraphs (a) and (b).  Penalties paid pursuant to this CAFO are not deductible for federal purposes under 28 U.S.C. § 162(f).

107. Each Party will pay its own costs and attorneys' fees.

## XIV.  RESERVATION OF RIGHTS AND RELEASE

108. Notwithstanding any other provision of this CAFO, an enforcement action may be brought pursuant to Section 7003 of RCRA, 42 U.S.C. § 6973, or other applicable statutory authority, to address conditions that may present an imminent and substantial endangerment to human health or the environment.

109. Except as provided in Paragraph 111, Complainant reserves the right to take enforcement action against Respondent to enforce the terms and conditions of this CAFO.

110. Except as expressly provided herein, nothing in this CAFO shall constitute or be construed as a release from any civil or criminal claim, cause of action or demand in law or equity for any liability Respondent may have arising out of, or relating in any way to, the release of any hazardous constituents, hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from its facilities.

111. Subject to the conditions in paragraph 112, EPA agrees not to sue or take administrative action against Walmart pursuant to RCRA and FIFRA for civil violations or alleged civil violations of the conditions, limitations and requirements of RCRA and FIFRA based on the following categories of violations committed prior to the execution of this Consent Agreement:

30

a.    any alleged violation of RCRA generator, transporter, or treatment, storage, or disposal facility requirements for the management of hazardous waste at Walmart Retail Facilities and the transportation of hazardous waste from Walmart Retail Facilities and Distribution Centers to Walmart Return Centers; and

b.    any alleged violation involving the transportation, management, and disposal of FIFRA-regulated products shipped from any Return Center to Greenleaf.

112. EPA's agreement not to sue or take administrative action against Walmart as described in paragraph 111 is conditional upon the accuracy of Respondent's representations to EPA related to the EPA Allegations and Determinations set forth in Section X of this CAFO, including the following:

a.    That, outside of California and Missouri, on average fewer than 300 of its stores episodically generated more than 100 kg of potentially RCRA "hazardous waste" in any given month during the time period of the alleged violations;

b.    that unmanifested hazardous waste as part of the Reverse Distribution Process shipped from Walmart's Retail Facilities were not sent to destinations other than Walmart Distribution Centers, Walmart Return Centers, or Greenleaf;

c.    that all pesticides shipped by Walmart to Greenleaf have since been removed from Greenleaf's facilities and disposed of in accordance with all applicable laws; and

113. Unless specifically allowed under the terms of this CAFO, this CAFO may be amended or modified only by written agreement executed by both the EPA and Respondent.

114. Walmart may alter the organizational requirements or implementation structure described in this Consent Agreement, Appendix A and any Work Plan in response to future business needs. In the event that any of the positions outlined in this Consent Agreement, Appendix A or any Work Plan cease to exist in the Walmart organization or are otherwise substantially modified, the responsibilities of the position eliminated will be added to the responsibilities of the remaining

31

positions or to those of an equivalent position under a new title or to a third party. Within 30

Days after a significant change has taken effect, Walmart will send EPA notice of the

reorganization and the title and general job description of the person(s) to whom the

responsibilities have been given.

## XV.  DISPUTE RESOLUTION

115. The dispute resolution procedures of this Section shall be the exclusive mechanism to resolve

disputes arising under or with respect to this CAFO.

116. If Respondent disagrees, in whole or in part, with any decision by EPA under this CAFO,

Respondent shall notify EPA through the Chief of the Waste Enforcement Branch, and the

Parties shall use their best efforts to informally and in good faith resolve all disputes or

differences of opinion relating to this CAFO.

117. In the event that the Parties cannot resolve a dispute by informal negotiations under the

preceding paragraph, Respondent may pursue the matter by submitting its objection to the Chief

of the Waste Enforcement Branch of EPA in writing. Respondent's written objections must set

forth the specific points of the dispute, the basis for Respondent's position and any matters which

it considers necessary for EPA's determination.

118. EPA and Respondent shall have thirty (30) days from receipt of Respondent's written

objections to attempt to resolve the dispute through formal discussions.

119. Within sixty (60) days of EPA's receipt of Respondent's written objections, EPA, through the

Chief of the Waste Enforcement Branch of EPA, will provide to Respondent in writing EPA's

decision on the pending dispute.

120. If the Respondent disagrees with the written decision, the Respondent may, within thirty (30)

days of receipt of the written decision, appeal to the Director, Waste and Chemical Enforcement

Division. Respondent's appeal must set forth the specific points of the dispute, the basis for

Respondent's position and any matters which it considers necessary for EPA's determination.

Within thirty (30) days of receipt of the appeal, the Director, Waste and Chemical Enforcement Division will issue a written decision.

121. If Respondent disagrees with the written decision of the Director, Waste and Chemical Enforcement Division, within sixty (60) days of receipt of the Director's decision, Respondent may file an appeal of that decision with the Environmental Appeals Board ("EAB").

122. The Parties may, by mutual written agreement, extend any of the time periods provided for in the dispute resolution process.

## XVI. FORCE MAJEURE

123. A "Force Majeure event" is any event beyond the control of Walmart, its contractors, or any entity controlled by Walmart that delays the performance of any obligation under this CAFO despite Walmart's reasonable efforts to fulfill the obligation. "Reasonable efforts" includes anticipating any potential Force Majeure event and addressing the effects of any such event: (1) as it is occurring, and (2) after it has occurred, such that the delay is minimized to the greatest extent reasonably possible.

124. Walmart agrees to notify the United States by written notice as soon as possible, but not later than 72 hours after the time Walmart first knew of any event which might constitute a Force Majeure event. The written notice Walmart submits pursuant to this Paragraph will indicate whether Walmart claims that the delay should be excused due to a Force Majeure event. The notice will describe the basis for Walmart's contention that it experienced a Force Majeure delay, the anticipated length of the delay, the cause or causes of the delay, the measures taken or to be taken to prevent or minimize the delay, and the timetable by which those measures will be implemented. Walmart agrees to adopt all reasonable measures to avoid or minimize such delay.

125. If the United States finds that a delay in performance is, or was, caused by a Force Majeure event, the United States agrees to extend the time for performance, in writing, for a period to compensate for the delay resulting from such event, and stipulated penalties will not be due for

33

such a period. In proceedings on any dispute regarding a delay in performance, Walmart will

have the burden of proving, by a preponderance of the evidence, that the delay is, or was, caused

by a Force Majeure event and that the amount of additional time requested is necessary to

compensate for that event.

126. An extension of one compliance date based on a particular event will not automatically extend

any other compliance date. Walmart will make an individual showing of proof regarding the

cause of each delayed incremental step or other requirement for which an extension is sought.

## XVII. OTHER APPLICABLE LAWS

127. All actions required to be taken pursuant to this CAFO shall be undertaken in accordance with

the requirements of all applicable local, state, and Federal laws and regulations. Respondent

shall obtain or cause its representatives to obtain all permits and approvals necessary under such

laws and regulations.

## XVIII. PARTIES BOUND

128. This CAFO shall be binding upon Respondent and its successors and assigns. Respondent shall

cause its officers, directors, employees, agents, and all persons, including independent

contractors and consultants acting under or for Respondent, to comply with the provisions hereof

in connection with any activity subject to this CAFO.

129. No change in ownership, partnership, corporate, or legal status relating to the facility will in any

way alter Respondent's obligations and responsibilities under this CAFO.

130. The undersigned representative of Respondent hereby certifies that he is fully authorized to

enter into this CAFO and to execute and legally bind Respondent to this CAFO.

## XIX. SEVERABILITY

131. It is the intent of the parties that the provisions of this CAFO are severable. If any provision or

authority of this CAFO or the application of this CAFO to any party or circumstances is held by

any judicial or administrative authority to be invalid or unenforceable, the application of such

34

provisions to other parties or circumstances and the remainder of the CAFO shall remain in force and shall not be affected thereby.

## XX. EFFECTIVE DATE

132. This CAFO is effective upon the filing of the Final Order. 40 C.F.R. § 22.31(b).

133. The terms of this Consent Agreement will be effective for a period of five (5) years from the filing of the Final Order. After five (5) years from the effective date, this Consent Agreement terminates, provided Walmart has complied with the payment requirements set forth in Section XIII. This Consent Agreement may also be terminated at an earlier date upon agreement of Walmart and the EPA.

35

**AGREED AND CONSENTED TO:**

FOR COMPLAINANT:


Rosemarie A. Kelley, Director
Waste and Chemical Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

Date:  5/14/13


Kenneth C. Schefski, Associate Director (Counsel for Complainant)
Waste and Chemical Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

Date:  5/14/2013

36

**FOR RESPONDENT:**

_(signature)_

Phyllis Harris
Wal-Mart Stores, Inc.
Senior Vice President,
Chief Compliance Officer
Wal-Mart Stores, Inc.

Date: 4/03/2013

_(signature)_

Raymond B. Ludwiszewski
Gibson, Dunn & Crutcher LLP
Washington Square
1050 Connecticut Ave NW
Washington, DC 20036

Date: _____

Attorney for Wal-Mart Stores, Inc.

37

This page is intentionally left blank.



## BEFORE THE ENVIRONMENTAL APPEALS BOARD
## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### WASHINGTON, D.C.

| | | |
|---|---|---|
| IN THE MATTER OF | ) | EPA Docket Nos. |
| | ) | RCRA-HQ-2013-4001 |
| | ) | FIFRA-HQ-2013-5056 |
| | ) | |
| | ) | |
| Wal-Mart Stores, Inc. | ) | Proceeding Under Section 3008(a) of the |
| 702 SW 8th Street, | ) | Resource Conservation and Recovery Act, |
| Bentonville, AR 72716-8611 | ) | 42 U.S.C. § 6928(a); Section 14(a) of the |
| | ) | Federal Insecticide, Fungicide and |
| | ) | Rodenticide Act, as amended, 7 U.S.C. |
| | ) | § 136*l*(a) |

## FINAL ORDER

Pursuant to Section 3008(a) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(a), and Section 14(a) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136(a), Complainant, United States Environmental Protection Agency (EPA or Agency), and Respondent, Wal-Mart Stores Inc. (Walmart) (collectively, the Parties), having signed and consented to entry of the attached Consent Agreement incorporated by reference into this Final Order,

IT IS ORDERED THAT:

1. Respondent, Wal-Mart Stores, Inc., shall comply with all terms of the Consent Agreement;

2. Respondent is assessed a civil penalty of **Seven Million Six Hundred and Twenty Eight Thousand Dollars (7,628,000).**

3. Respondent shall, in accordance with the payment provisions set forth in the Consent Agreement, make payment via a certified or cashier's check or through a wire transfer as described in the Consent Agreement.

IT IS SO ORDERED.

By: _Anslin M. Fraser_
                     Environmental Appeals Board

Dated: _May 28, 2013_

Case 4:13-cr-00135-JTM   Document 2   Filed 05/28/13   Page 51 of 60

*In the Matter of Wal-Mart Stores, Inc: RCRA HQ 2013-4001; FIFRA HQ 2013-5056*

## CERTIFICATE OF SERVICE

I certify that the foregoing Final Order in the Matter of Wal-Mart Stores, Inc., Docket Nos. RCRA-HQ-2013-4001 and FIFRA-HQ-2013-5056, was filed and copies of the same were mailed to the parties as indicated below:

**Via Interoffice Mail and Facsimile**

Kenneth C. Schefski
Waste and Chemical Enforcement Division
Office of Civil Enforcement/OECA/US EPA
1200 Pennsylvania Ave., NW  (Mail Code 2249A)
Washington, DC  20460-0001
Fax: 202-564-0022

**Via U.S. Certified Mail and Facsimile**

Raymond B. Ludwiszewski
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
USA
Fax: 202-530-9562

Annette Duncan
Secretary

Dated: 5/28/2013

40

## APPENDIX A

**(This attachment is BUSINESS CONFIDENTIAL and filed under seal)**

**REDACTED VERSION**

# APPENDIX A

1

**APPENDIX B**

1

# APPENDIX B

## PRODUCTS DISTRIBUTED BY WALMART TO GREENLEAF LLC

**Registration #:**      538-282

**Registration Name:**      TURF BUILDER PLUS 2 R

**Company:**      538 - SCOTTS COMPANY, THE

| Name | Status |
|------|--------|
| TURF BUILDER WINTERGUARD WITH PLUS 2 WEED CONTROL | Alternate |
| TURF BUILDER WITH PLUS 2 WEED CONTROL | Alternate |

**Registration #:**      538-281

**Registration Name:**      WINTERIZER WITH PLUS 2 WEED CONTROL

**Company:**      538 - SCOTTS COMPANY, THE

Note: There are no other brand names.

**Registration #:**      538-18

**Registration Name:**      SCOTTS BONUS S

**Company:**      538 - SCOTTS COMPANY, THE

| Name | Status |
|------|--------|
| SCOTTS BONUS S | Active |
| WEED & FEED FOR ST. AUGUSTINES GRASS | Alternate |
| SCOTTS BONUS S WEED CONTROL PLUS LAWN FERTILIZER | Alternate |

2

Registration #:          2217-660-538

Registration Name:       WEED AND FEED

Company:                 538 - SCOTTS COMPANY, THE


Registration #:          279-3203-538

Registration Name:       INSECT CONTROL PLUS LAWN FERTILIER

Company:                 538 - SCOTTS COMPANY, THE

| Name | Status |
|------|--------|
| TURF BUILDER WITH SUMMERGUARD | Alternate |

Registration #:          2217-827-538

Registration Name:       EXPERT GARDENER WINTERIZER WEED & FEED

Company:                 538 - SCOTTS COMPANY, THE

| Name | Status |
|------|--------|
| EXPERT GARDENER WINTERIZER WEED & FEED | Active |
| EXPERT GARDENER WEED & FEED | Alternate |

Registration #:          538-190

Registration Name:       SCOTTS TURF BUILDER PLUS HALTS FOR LAWNS

Company:                 538 - SCOTTS COMPANY, THE

| Name | Status |
|------|--------|
| STEP 1 CRABGRASS PREVENTER PLUS LAWN FERTILZER | Alternate |

3

**Registration #:**                    2217-660-62355

**Registration Name:**             MIRACLE-GRO LAWN FERTILIZER PLUS
                                              WEED CONTROL

**Company:**                          62355 - MIRACLE-GRO LAWN PRODUCTS
                                              INC

| Name | Status |
|------|--------|
| MIRACLE-GRO FALL LAWN FERTILIZER PLUS WEED CONTROL | Alternate |
| MIRACLE-GRO LAWN FERTILIZER PLUS WEED CONTROL | Active |

**Registration #:**                    538-202

**Registration Name:**             CRABGRASS PREVENTER PLUS LAWN FOOD

**Company:**                          538 - SCOTTS COMPANY, THE

| Name | Status |
|------|--------|
| TURF BUILDER WITH HALTS CRABGRASS PREVENTER | Alternate |

4

**APPENDIX C**

5

## APPENDIX C

- Alabama
- Alaska
- Arizona
- Arkansas
- California
- Colorado
- Connecticut
- Delaware
- Florida
- Georgia
- Hawaii
- Idaho
- Illinois
- Indiana
- Iowa
- Kansas
- Kentucky
- Louisiana
- Maine
- Maryland
- Massachusetts
- Michigan
- Minnesota
- Mississippi
- Missouri
- Montana
- Nebraska
- Nevada
- New Hampshire
- New Jersey
- New Mexico
- New York
- North Carolina
- North Dakota
- Ohio
- Oklahoma
- Oregon
- Pennsylvania
- Puerto Rico
- Rhode Island
- South Carolina
- South Dakota
- Tennessee
- Texas
- Utah
- Vermont
- Virginia
- Washington
- West Virginia
- Wisconsin
- Wyoming

6